IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

EDITH EDWARDS,                    }
                                  }
        Plaintiff,                }
                                  }      CIVIL ACTION NO.
v.                                }      07-AR-1653-S
                                  }
MCCAY, GILMORE & MCCAY, d/b/a     }
MEADOWS GOLF COURSE, et al.,      }
                                  }
        Defendants.               }


**<u>MEMORANDUM OPINION</u>**

Before the court is the motion of defendants, McCay, Gilmore, & McCay, d/b/a Meadows Golf Course ("MGM"), and Ronald McCay ("McCay"),[1] for summary judgment in the above-entitled action brought by plaintiff, Edith Edwards ("Edwards"), who claims hostile environment sexual harassment and constructive discharge in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and Alabama state-law torts of invasion of privacy and intentional infliction of emotional distress.[2] For the reasons that follow, defendants' motion will be granted in part and denied in part.

---

[1] In Edwards's original complaint, Edwards errantly referred to defendants as "McKay, McKay & Gilmore" and "Ronald McKay." In defendants' answer (Doc. No. 5), defendants corrected Edwards's errors and alerted the court to the correct names "McCay, Gilmore & McCay" and "Ronald McCay." Yet neither party moved to have the record and style corrected. The court deems all previous filings to reflect the proper names and style of the case as noted in defendants' answer.

[2] In her original complaint filed on September 11, 2007, Edwards pled these four causes of action. On October 3, 2007, Edwards amended her complaint to add a fifth claim, "Negligent and Malicious Retention, Supervision, and Training," which she later voluntarily dismissed in her response to defendants' motion for summary judgment (Doc. No. 20).

*I. Pertinent Undisputed Facts*[3]

MGM is an LLC owned by two natural persons, McCay and Gilmore, and the estate of the late Joe McCay.[4] McCay has been the majority owner of MGM since 2000. Gilmore Dep. 13:1-14:5, Mar. 24, 2008. At all relevant times, MGM neither had a sexual harassment policy nor a formal grievance procedure. McCay Dep. 100:1-21. Edwards worked at MGM from March 2005 until she quit on or about May 3, 2007. The disposition of this case turns on facts concerning the number of MGM's employees and facts concerning Edwards's allegations of unlawful conduct by McCay.

*A. The number of employees*

---

[3] Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In assessing whether the movant has met his burden, the court must view the evidence, and all inferences drawn therefrom, in the light most favorable to the non-movant. *Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 918 (11th Cir. 1993). At this juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)(citations omitted). This determination involves applying substantive law to the substantive facts that have been developed.  A dispute about a material fact is genuine if a reasonable jury could return a verdict for the nonmoving party, based on the applicable law in relation to the evidence developed. *See id.* at 248; *Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir. 1989).

[4] McCay holds a 69% interest, James Gilmore ("Gilmore") holds a 20.4% interest, and Joe McCay's estate holds a 11.57% interest. Gilmore Dep. 13:1-13. Of note, the late Joe McCay is a first cousin of defendant McCay. McCay Dep. 9:3-8, March 24, 2008. He died on December 14, 2006. Gilmore Dep. 11:16-17. Edwards makes no claim that any of the three are, or were, "employees."
    McCay and Gilmore both "worked" at MGM. However, none of the three were paid a salary. McCay Dep. 15:4-18; Gilmore Dep. 12:17-23.  McCay worked three days per week, Gilmore worked two days per week, and Joe McCay, until his death, worked the other two days. Gilmore Dep. 11:18-12:16. Since Joe McCay's death, no one has filled in for his two days. *Id.* Since the Meadows opened there have been no profits. McCay Dep. 15:4-16:4. According to McCay, any income generated has been put toward the promissory note on the land and toward paying the employees. *Id* at 15:23-16:4.

MGM employed fifteen or more employees for a total of four weeks during the 2006 calendar year. Defs. Mot. Summ. J. Br. 4. The number of MGM employees in the 2007 calendar year is disputed. It is undisputed that MGM employed fifteen or more employees for at least **18 weeks** of the 2007 calendar year. Edwards asserts, however, that three specific employees, Jason Beasley ("Beasley"), Dawn Akin ("Akin"), and Lisa Farrar ("Farrar") were:

> all initially employed before the pay periods ending on September 2 and September 16 and were all still employed after those pay periods. Consequently, those three individuals count toward the 15 employee minimum for the two referenced pay periods, giving MGM 17 employees for each of those pay periods and 15 or more employees for at least 22 weeks during 2007.

Pl.'s Resp. Br. 6-7. A table of the time-period in question is helpful.

| MGM Payroll Check Register (Dated by the Pay Period Ending) | Number of Employees |
|---|---|
| January 7, 2007 | 9 |
| January 21, 2007 | 9 |
| February 4, 2007 | 9 |
| February 18, 2007 | 9 |
| March 4, 2007 | 11 |
| March 18, 2007 | 11 |
| April 15, 2007 | 13 |
| April 29, 2007 | 12 |
| May 13, 2007 | 13 |
| May 27, 2007 | 15 |

| June 10, 2007 | 14 |
|---|---|
| June 24, 2007 | 15 |
| July 8, 2007 | 16 |
| July 22, 2007 | 17 |
| August 5, 2007 | 17 |
| August 19, 2007 | 17 |
| **September 2, 2007** | **14** |
| **September 16, 2007** | **14** |
| September 30, 2007 | 17 |
| October 14, 2007 | 15 |
| October 28, 2007 | 16 |
| November 11, 2007 | 14 |
| November 25, 2007 | 14 |
| December 9, 2007 | 13 |
| December 23, 2007 | 12 |

Defs.' Mot. Summ. J. Br. Ex. 18-27. Beasley, Akin, and Farrar appear on the August 19, 2007 payroll check register and again on the September 30, 2007 payroll check register. Edwards has not filed any evidence, affidavit or otherwise, concerning Beasley and Akin's status as employees during September, 2007. Defendants aver that all three

> were part-time employees who worked for MGM on an "as needed" basis. When work is slow and they are not needed, they are laid off in that they are informed that they will be contacted if and/or when they may be needed in the future for purposes of working a golf tournament or if we are doing a major maintenance project on the course.

McCay Aff. 1:5-6, Oct. 2, 2008. Farrar, declared:

4

> I am occasionally a part-time employee of The Meadows
> Golf Course and started back in 2007. . . .  Since 2007,
> I have worked for The Meadows on an as needed basis to
> run the beverage cart . . . . When I am not needed, I am
> informed that I will be called if needed in the future.
> During these time periods, I do not consider myself to be
> an employee of The Meadows and I am technically laid off
> because I am not needed.

Farrar Decl. 1:2-4, Oct. 3, 2008.

Edwards also alleges that the marshals and starters are "employees" of MGM. If the marshals are included as employees, MGM will have fifteen or more employees for twenty or more calendar weeks of both 2006 and 2007. Marshals "drive around the golf course to monitor pace of play and ensure that course rules are being followed," and starters "check a customer's ticket before the customer tees off on the first tee." McCay Aff. 2:10. The marshals and starters (hereinafter collectively "marshal(s)") also "communicate with customers, drive a [MGM] golf cart and ensure that a customer has paid for their round." *Id.* at 2:11-12.

The marshals are not paid cash by MGM. They are, however, allowed to play free rounds of golf whenever they want. *Id.* at 2:9; McCay Dep. 19:13-20:16. From 2004 until February 2006, MGM kept a notebook which itemized each shift by each marshal, and, for each shift, the marshal earned a free round of golf. In February 2006, due to what McCay calls a "paperwork nightmare," MGM "basically turned it over to the . . . marshals and said you play when you want to play, we're not going to keep up with it, it's your deal." *Id.* at 18:11-19:11. Friends of marshals and former marshals can

also play for free. *Id* at 19:21-23*; McCay Aff. 2:9. Of note, MGM does not report the marshals as "employees" to any governmental agency, nor does it pay for worker's compensation insurance on them. *Id.* at 2:14. Marshals likewise receive no health insurance or unemployment benefits. *Id.* at 2:17. McCay has never terminated a marshal or starter. *Id.* at 2:16.

*B. Edwards's MGM work history, MGM's management structure and allegations of unlawful conduct*

Edwards worked in several jobs at MGM. From March to December 2005, she worked as a "cart person," where she was responsible for pulling up golf carts for customers, keeping the carts charged, and picking up balls on the driving range. From December 2005 to February 2006, she worked in maintenance, where, *inter alia*, she was responsible for painting and cutting grass. From February 2006 until she quit, Edwards worked in the pro shop, where she was responsible for making tee times, assisting customers, working in the grill, and running the beverage cart[5] on the course itself. Edwards Dep. 72:13-19, March 24, 2008. According to Edwards, it was McCay's idea to move her into the pro shop to fill a vacancy. *Id.* at 73:18-75:8. Running the beverage cart was the most lucrative position for Edwards because she earned tips there. *Id.* at 154:21-23.

*1. MGM's management structure*

---

[5] The beverage cart is towed behind a golf cart to sell beverages and snacks on the course. McCay Dep. 57:11-21.

The management structure of MGM is somewhat unclear from the record. From March to December 2005, the general manager[6] of the course was Larry Lee ("Lee"). Gilmore Dep. 10:16-11:10, Edwards Dep. 54:15-55:19. To reduce costs, Lee was terminated. *Id.* at 11:3-4. The LLC members then took over Lee's responsibilities, which included "forms to fill out, make bank deposits, [and] enter data in the computer." *Id.* at 11:18-12:15. Brian Carmack ("Carmack") serves as the golf course superintendent. Edwards Dep. 86:13-21. His job duties include setting the work schedule for golf course employees,[7] including the pro shop and maintenance.

The record is likewise unclear as to who hires and fires people at MGM.[8] Tim Sloan ("Sloan") is in charge of the "cart

---

[6] The record is unclear as to Lee's actual "title," if any. McCay testified Lee was the "director of golf." McCay Dep. 24:19-22. Whether or not Lee was a "director" or "manager" is of little import. For the purposes of summary judgment, viewing the facts in the light most favorable to Edwards, the court finds Lee had some degree of supervisory role at MGM.

[7] The record reflects the marshals have no set schedule. McCay Dep. 19:7-11.

[8] McCay's contradictory testimony concerning his role in employment decisions is scattered throughout his deposition, but particularly on pages 24:11-27:16. To illustrate, McCay testified:

Mr. Schell (attorney for Edwards): Did you have anything to do with hiring Edith Edwards?
McCay: No, sir.

. . . .

Mr. Schell: You just find out about people when you show up and they're there?
McCay: In essence if we need somebody or **I think we need somebody** or we need somebody in maintenance, **I'd ask [Carmack] do we need somebody.** And the best example I can give you, this summer we need somebody and he got two guys through [sic] work release program to come in to -- colored gentlemen to work.

barn," and, according to McCay, Sloan hired Edwards. However, given the procedural posture, McCay appears to retain the authority to make employee hiring and personnel decisions.[9] McCay also testified that he told Carmack to find someone to replace a former employee in the pro shop. McCay Dep. 41:6-42:8. Carmack suggested Edwards, and McCay agreed. *Id.* For the most part, there was only one employee working in the pro shop at any one time. Thus, once transferred, Edwards was isolated in the pro shop.

In regards to control and decisions of the LLC, both McCay and Gilmore testified that MGM's operates under an "one man, one vote" oral agreement. McCay Dep. 9:13-16; Gilmore Dep. 49:3-51:20. Since Joe McCay's death, his estate has not participated in the management of MGM, and, thus, there has been no tie-breaking vote. Gilmore Dep. 49:3-51:20. Gilmore testified, however, that there has never been a situation where a decision required a tie-break. *Id.* Yet despite the purported the "one man, one vote" agreement, there is testimony calling into question its existence. After Edwards quit, there is conflicting testimony as to whether she wanted her job back.[10] Gilmore testified he questioned McCay about McCay's

---

McCay Dep. 24:11-13; 25:18-26:4 (emphasis added). In addition, concerning Edwards's last day, McCay testified that he said "**I'm letting Ms. Douglas -- Shonda is going to work this weekend.**" *Id.* at 77:15-19 (emphasis added).

[9] *See supra* note 8 and accompanying text.

[10] Edwards testified that she called both McCay and Gilmore after she quit to apologize for quitting so abruptly, but did not ask for her job back from either of them. Edwards Dep. 109:12-15. McCay testified that she called him, that she was "apologetic," and wanted her job back. McCay Dep. 82:16-19.

conversation with Edwards.  Gilmore testified that McCay told him that McCay had made the following statement to Edwards: "[Gilmore] was the minority stockholder and [he'd] have to live with [McCay's decision] . . . ." *Id.* at 41:6-12.

Viewed in a light most favorable to Edwards, the record reflects that McCay, being the majority owner of MGM and without an active tie-breaking vote, is the final decision-maker in regards to all MGM employee personnel decisions.[11]

*2. Edwards's allegations*

According to Edwards, McCay often engaged in obscene, insulting, and/or offensive behavior at the workplace.  The following is a list[12] of all such behavior in which Edwards says McCay engaged:

1.  In approximately **April 2005**, McCay first met Edwards. McCay introduced himself, omitting that he was the majority owner of MGM, and asked Edwards whether she was married and whether she had children. Edwards Dep. 57:15-59:15; 63:14-64:7. Edwards responded that she had children, and McCay responded "with that many kids, you must enjoy sex an awful lot." *Id.* at 63:21-64:2. McCay

---

[11] *See supra* note 8 and accompanying text. As discussed *supra*, whether marshals are employees is disputed. Thus "employee personnel decisions" in this context refers only to the persons MGM admits were employed.

[12] Edwards testified that it would be difficult to "remember every single incident because there's been so many." Edwards Dep. 79:11-13. This list is "exhaustive" to the extent that it contains incidents Edwards can specifically recall.

then talked about his love life with his wife, stating that he "enjoyed getting blow jobs but his wife no longer does those things." *Id.* at 58:10-15. At the time, Edwards did not know who McCay was, nor that he was the majority owner of the golf course. *Id.* at 59:3-9. Edwards immediately informed then-manager Lee that the conversation had embarrassed her. *Id.* At this point, McCay was some distance away in the parking lot. From afar, Edwards pointed to the man who made the embarrassing comments, inviting Lee to look. *Id.* at 59:2-15. Lee asked her, "Do you know who that is?" Edwards Dep. 59:2-15. Edwards said, "no." Lee then told her, "that's the owner of the golf course." *Id.* Edwards stated she felt "like [she] had put her foot in [her] mouth," because of Lee's unreceptive response to her complaint and because she knew that Lee and McCay were friends. *Id.* Edwards did not report to Lee any other incidents involving McCay. McCay testified that Lee never reported to him Edwards's complaint about the conversation in April 2005. McCay Dep. 36:16-20.

2. **On several occasions before February 2006,** McCay told Edwards that she was beautiful and that she ought to wear shorter shorts and lower cut shirts. Edwards Dep. 65:11-18.

3.  While McCay's offensive behavior continued throughout Edwards's time at MGM, McCay would "stop for a while, sometimes weeks at a time and then he would resume right back." *Id.* at 114:9-12.

The remaining alleged behavior occurred after Edwards began working in the pro shop:

4.  **At least once**, when McCay saw Edwards drinking a drink, McCay would make a comment like, "I've got something you can suck on," or "I got something that would taste better than your drink." *Id.* at 76:15-19.

5.  **At least once**, when McCay saw Edwards bending over to put drinks in the cooler, he would say something like "I'd like to have you in that position." *Id.* at 76:20-23.

6.  **In late 2006**, McCay was sitting at his computer showing her how to do rounds analysis, and McCay looked down at his lap, inviting Edwards to look there. *Id.* at 77:9-18. "He was hard and had a little small wet spot on his khaki pants," Edwards testified. *Id.* at 77:15-18. She testified McCay then said, "You see what you do to me." Edwards Dep. 77:15-16.

7.  **At least once**, when McCay saw Edwards eating or chewing gum, he would make a comment like, "I'd love to be eating you." *Id.* at 78:15-18.

8.  **Once** when Edwards had a pair of shorts on that looked

like a skirt, McCay said, "he would love to have his hands up [Edward's] skirt tasting [her] pussy." *Id.* at 78:21-79:3. McCay likewise asked, "What color panties [Edwards] had on or if [she] had any on at all." *Id.* at 79:4-5.

9.  **At least once**, McCay said "I'd love to shoot a load of my cum on your dairy air [sic]." *Id.* at 79:14-15.

10. Edwards has migraine headaches, and, **on several occasions**, McCay "would tell [Edwards] that he would love to give me a massage and that him giving me a massage and making love to me that it would definitely go away." *Id.* at 80:11-15.

11. **Once**, during working hours, McCay asked Edwards to meet him at the maintenance shop for sex. Edwards Dep. 80:15-20.

12. **On several occasions**, McCay told Edwards that he had dreams about her and he dreamed "he was up inside of [her] all night." *Id.* at 81:18-22.

13. **Once**, McCay told Edwards, "[H]e has pictured [her] lips around his cock." *Id.* at 82:1-3.

14. **Once**, McCay showed Edwards pornography of persons engaged in sexual intercourse on his office computer. *Id.* at 82:15-83:22. A short time later, McCay came to the door of his office, within sight of Edwards, and "started

12

rubbing on himself" looking at Edwards. *Id.* at 83:22-84:19. Edwards immediately left the pro shop, and started doing some housekeeping at the grill. Carmack came into the pro shop, heard the phone ringing, and asked why Edwards was not answering the phone. Edwards "just shook [her] head no." Edwards Dep. 85:3-7. Edwards told Carmack she was not going back into the pro shop. After Carmack told Edwards that McCay had left for the day, Edwards returned to the pro shop and informed Carmack about the incident. *Id.* at 85:9-22.

15. **Once**, while Edwards was doing a cash drawer balance report in the pro shop, McCay walked up behind her and "grabbed [her] on the butt" whereupon she "pushed him back and told him not to ever do that again." *Id.* at 89:7-93-8. McCay later apologized. *Id.* This was the only time McCay ever physically touched Edwards. *Id.*

16. **At least once**, McCay suggested using "sex toys and dildos" on Edwards and told Edwards what "he would love to do" with them. *Id.* at 98:22-99:10.

17. **On several occasions, and frequently during April 2007**, McCay made gestures with his tongue directed at Edwards "in a sexual way." Edwards Dep. 115:8-23.

18. On Edwards's last day, **on or about May 3, 2007**, Edwards says that McCay called her into his office and told her

that a new pro shop employee, Shonda Douglas ("Douglas"), and not Edwards, would run the beverage cart during the upcoming weekend golf tournament. *Id.* at 93:19-95:7. When Douglas was hired, McCay informed Edwards and Douglas that they were to alternate weekends. *Id.* For some reason, Douglas had not worked the previous two weekends. However, this was Edwards's scheduled weekend. *Id.* McCay told Edwards it was because Douglas "needed the money." *Id.* Edwards felt this change in schedule was "unfair," at which point McCay told her, "**Well, if you give me what I want, then maybe you'll get what you want.**" Edwards Dep. at 95:7-10 (emphasis added). Edwards believes this to have been a *quid pro quo* offer, i.e., sexual favors for the opportunity to work that weekend on the beverage cart. At this point, Edwards walked out of the office, threw her keys at Carmack, and told him "she quit" and that she "couldn't take it anymore." *Id.* In her EEOC charge, Edwards alleged that it appeared Douglas and McCay had a personal relationship and testified that she felt as if she was being "pushed out" because Douglas had been hired. *Id.* at 113:5-11.

19. **Throughout April 2007**, Edwards testified that the inappropriate comments were constant. *Id.* at 115:15-16.

14

Edwards testified she would generally react to these incidents either by ignoring McCay, "pretend[ing] it didn't happen," or by responding to McCay saying things like "you're married, I'm married, I'm happily married, you're married, you shouldn't be thinking like this . . . ." *Id.* at 82:14-83:6. Edwards testified that there were no witnesses to any of these events. *Id.* at 82:4-6. Edwards also testified that these comments "affected the way that [she] would dress, I didn't want to wear anything too revealing . . . I wanted to stay covered as much as possible." Edwards Dep. 117:9-17. Edwards also testified she never mentioned McCay's conduct to Gilmore or to the late John McCay because she was afraid she would lose her job. *Id.* at 37:14-38:3.

Edwards testified that her work schedule was flexible. Edwards Dep. 132:9-22; *see also* Pla.'s Resp. Br. 9. Edwards asked Carmack to modify her schedule in order to avoid working the same days as McCay. *Id.* According to Edwards, after learning of the conduct described *supra*, Carmack complied with her request and, when possible, modified her schedule accordingly. *Id.* When Edwards and McCay were working the same day, Edwards testified that she asked both Carmack and several marshals, including Dave McComish, Henry Coleman, Dan Holder, Rex Shannon, Bob Bloom, and Roy Hartsfield,[13] to stay with her in the pro shop to prevent her and

---

[13] Edwards testified she was unsure of whether the marshal listed in the accompanying text as "Dave McComish" was named "Dave McCormick or Dave McCormish." Edwards Dep. 22:10-23:13. However, in Edwards's response brief,

McCay from being alone together. Pla.'s Resp. Br. 9; Edwards Dep. 131:13-22. Edwards testified that she told the marshals about McCay's conduct as a reason for needing their company. Pla.'s Resp. Br. 9; Edwards Dep. 36:5-13.

*3. Defendants' response*

Defendants expressly and categorically deny that McCay ever engaged in any obscene, insulting, and/or offensive behavior in the workplace. McCay Dep. 53:11-20. Instead, McCay claims that Edwards quit after she had been caught stealing. "Ms. Edwards was selling beer on the course out of the beverage cart and pocketing the money[,] and her in collusion with Mr. Carmack knew about it and he was helping her do it." *Id.* at 75:3-9; *see also id.* at 63:5-80:23 (discussing the full details of the allegations). On the other hand, Edwards expressly and categorically denies ever stealing anything from MGM. Edwards Dep. 149:19:-152:23.

In addition, McCay testified that Edwards and Carmack were having a improper personal relationship, based, in part, on the "amount of time they spen[t] together." *Id.* at 90:7-12. When McCay confronted them, McCay testified that Carmack and Edwards denied any such relationship. *Id.* at 90:22-97:22. Edwards categorically denies any such improper personal relationship, sexual or otherwise. Edwards Dep. 126:9-10.

---

she filed a list of marshals which contains the name "Dave McComish," and the court assumes this is the correct spelling of this marshal's name. Pla.'s Mot. Summ. J. Resp. Br. Ex. 7.

*II. Analysis*

While no party addresses the issue of whether the actions of McCay are imputed automatically to MGM, the issue must be addressed. *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275 (1998), affirmed the rule that a supervisor may hold such a high position in a company as to be "indisputably within that class of an employer organization's officials who may be treated as the organization's proxy." *Id.* at 789-90 (citations omitted). In *Farrager's* companion case, *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257 (1998), the Court also held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Id.* at 765. McCay is the majority owner of MGM. He also has *de facto* control over personnel decisions. McCay can be considered the "proxy" of MGM, and MGM arguably may be held liable for his conduct.

*A. Is MGM an employer?*

Under Title VII, an "employer" is a "person engaged in an industry affecting commerce who has **15 or more employees** for each working day in each of **20 or more calendar weeks** in the current or preceding year." 42 U.S.C. § 2000e(b)(emphasis added).[14] Title VII's

---

[14] Defendants claim that "[a] district court lacks subject matter jurisdiction to entertain a suit against an entity that does not fall under Title VII's statutory definition of employer." Defs.' Mot. Summ. J. Br. 12

definition of "employee" is "an individual employed by an employer." 42 U.S.C. § 2000e(f). "The 'current year' is the year in which the alleged discriminatory act occurred . . . ." *Graham v. Colonial Bank*, No. 06-270, 2007 WL 136752 at *3 (M.D. Ala. 2007)(quotation marks in original). Whether MGM is an "employer" turns on whether (1) Beasley, Akin, or Farrar was an "employee" from August 19, 2007, to September 2, 2007, or from September 2, 2007, to September 16, 2007, or (2) whether the marshals count as "employees."

*1. Are Beasley, Akin, and/or Farrar employees?*

Edwards relies solely on *Walters v. Metro. Educ. Enters.*, 519 U.S. 202, 117 S. Ct. 660 (1997), to support her proposition that "all one needs to know about a given employee for a given year is whether the employee started or entered employment during that year, and, if so, when. He is counted as an employee for each working day after arrival and before departure." Pla.'s Resp. Br.

---

(citing *Lyes v. City of Riviera Beach*, 166 F.3d 1332 1340-41 (11th Cir. 1999)). Edwards does not dispute defendants' assertion. However, the Supreme Court has recently held that the "threshold number of employees for application of Title VII is an element of a plaintiff's claim for relief, not a jurisdictional issue." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516, 126 S. Ct. 1235, 1245 (2006); *see also Thomas v. Ala. Home Constr.*, 271 Fed. Appx. 865, 867 (11th Cir. 2008)(applying the *Arbaugh* holding to a motion to dismiss); *Fender v. Clinch County Ga.*, No. 08-10440, 2008 WL 4491988, at *1 (11th Cir. Oct. 8, 2008)(applying the *Arbaugh* holding to a motion for summary judgment). Even though it is an element of the plaintiff's claim, and no longer a jurisdictional bar, it is still an element of Edwards's *prima facie* case, and is thus discussed first.

6 (quoting *Walters*, 519 U.S. at 211).[15] Edwards contends that the evidence creates a fact issue as to whether Beasley, Akin, and/or Farrar are employees.

In *Walters*, an employee sued her former employer for retaliation. *Id.* at 205. The defendant-employer had two part-time employees who "ordinarily skipped one working day each week." *Id.* at 205. The employer reasoned that these employees did not count toward the "15 or more employees" requirement, because the employer was not compensating them on each work day of each work week. *Id.* at 205. The district court dismissed the case. The Seventh Circuit affirmed, holding that "an employer 'has' an employee for a particular working day within meaning of § 2000e(b) only when he is actually compensating the individual on that day." *Id.* at 206. A unanimous Supreme Court reversed, adopting, *inter alia*, the "payroll method." *Id.* at 206. The Court stated, "The test for when an employer 'has' an employee is no different from the test for when an individual *is* an employee: whether the employer has an employment relationship with the individual on the day in question. This test is generally called the 'payroll method,' since the employment relationship is most readily demonstrated by the individual's appearance on the employer's payroll." *Id.* at 206 (emphasis and quotation marks in original). The Court then

---

[15] The *Walters* opinion states "started or ended," not "started or entered." The court assumes this is a typographical error.

undermined the employer's argument, reasoning that "[t]he approach it suggests would turn the coverage determination into an incredibly complex and expensive factual inquiry." *Id.* at 210. At the end of the section exploring what the Court found to be the employer's flawed reasoning, section II(B), the Court made the statement upon which Edwards now relies.[16] The Court said in conclusion that the "ultimate touchstone under § 2000e(b) is whether an employer has **employment relationships** with 15 or more individuals for each working day in 20 or more weeks during the year in question." *Id.* at 211 (emphasis added). While the Court failed expressly to fix the contours of "employment relationships," it affirmatively agreed with Walters's argument that "an individual who appears on the payroll but is not an 'employee' under traditional principles of agency law, see, *e.g., Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24, 112 S. Ct. 1344, 1348-49, 117 L. Ed. 2d 581 (1992), would not count toward the 15-employee minimum." *Id.* at 666 (quotation marks in original).

Defendants here disagree with Edwards's interpretation of *Walters*. Defendants cite to *Owens v. S. Dev. Council, Inc.*, 59 F. Supp. 2d 1210 (M.D. Ala. 1999), for the proper interpretation of *Walters. Owens*, F. Supp. 2d at 1214 (quoting *Walters*, 519 U.S. at 206, 211). In *Owens,* Judge Thompson held:

---

[16] *See supra* note 16 and accompanying text.

> An employment relationship is most readily demonstrated by the individual's appearance on the employer's payroll. This test is called the payroll method. However, an individual's appearance on the employer's payroll is not necessarily dispositive, as an individual who appears on the payroll but is not an employee under traditional principles of agency law would not count toward the 15-employee minimum. Therefore, for an individual to be an employee under Title VII, the payroll method *and* the traditional agency-law definition of employee must be satisfied. **The failure to satisfy either element precludes a finding that an individual is an employee.**

*Id.* at 1214 (quotation marks omitted; first emphasis in original; second emphasis added).

This court agrees with defendants and with the Middle District of Alabama that Edwards's reading of *Walters* is flawed. First, Edwards reads the *Walters* quote out of context. Second, Edwards's reading of the quote does not support her position, based on the evidence here presented. As far as this court can tell, Edwards is essentially arguing that when the Supreme Court said "all one needs to know . . . is whether the employee started or ended employment during that year, and, if so, when," it meant, for purposes of this case, that because Beasley, Akin, and Farrar appear on the payroll on August 19, 2007, and again on September 30, 2007, they "started" during 2007, and "ended" during 2007, and that fact, *by itself*, so this argument goes, means that they were employees for the four weeks in question. A simple example is helpful in illustrating Edwards's error. By Edwards's reasoning, if an employee worked for an employer from January 1-8 of year A, and was later re-hired for December 24-31 of year A, that employee would be counted for Title

VII purposes from January 9 to December 23 of year A. If Edwards presented *other* evidence supporting an employment relationship between Beasley, Akin, and/or Farrar and MGM for the weeks in question, the court might have a different opinion under Rule 56 analysis. In other words, Edwards has not disputed defendants' evidence concerning Farrar and has offered no evidence whatsoever concerning Beasley or Akin. There is likely a situation in which an employee can appear on a payroll, disappear for a time, later return, and be considered an employee for the disputed, interim time period, but such a scenario is not presented here. In addition, there is nothing uncommon about an employer's hiring and laying-off part-time workers, and then repeating the hiring and laying-off. Again, other evidence might call for higher scrutiny in reviewing such an employment practice, particularly when the numbers are "so close" to 15 employees for 20 weeks as to create a basis for debate, but that is not the case here. Edwards's reliance upon *Walters* is misplaced.

In regards to defendants' argument based on *Owens*, the court respectfully disagrees that *Walters* **only** supports a conjunctive reading of "payroll method *and* the traditional agency-law definition of employee," and likewise disagrees that these are "elements." The conjunctive word "and" is appropriate, for instance, where an independent contractor is listed on a payroll, but is not, in fact, an employee under agency law. However, a

22

plaintiff can fail to satisfy the payroll method and yet be considered an employee. In other words, the possible avenues for demonstrating an "employment relationship" are not limited solely to the "payroll method." For example, an employee might never appear on the payroll, but pursuant to agency law, nonetheless be an employee for Title VII purposes. As discussed *infra*, the marshals may fit within this category. They would arguably fail the *Owens* test without any further inquiry because they failed to appear on the payroll. Perhaps a better name for this test is the "employment relationship test," with an asterisk noting "that the payroll method is the most common and arguably the easiest way of proving the employment relationship." In any event, Edwards has failed to rebut defendants' undisputed evidence, and the court need not answer whether an employment relationship existed during the disputed time-period insofar as Beasley, Akin, and Farrar are concerned. Taking the facts in the light most favorable to Edwards, the court finds no dispute of material fact as to whether Beasley, Akin, and/or Farrar were employees from August 19, 2007, to September 2, 2007, or from September 2, 2007, to September 16, 2007. Nor can the court draw any reasonable inference that "employment relationships" existed. This leaves Edwards short of the magic 15, that is, unless she can prove that the marshals were "employees."

*2. The marshals*

23

Defendants argue that the marshals were independent contractors or volunteers and not employees. Defendants argue that the "hybrid economic realities test" controls, citing *Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 340 (11th Cir. 1982), and *Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1234 (11th Cir. 2004). Edwards directs the court to *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 123 S. Ct. 1673 (2003). Edwards argues:

> [T]he Supreme Court [in *Clackamas*] stated that the question of who is an "employee" should be decided under general common law principles used to describe the conventional master servant relationship. MGM cannot contend that it does not direct the activities of its marshals and starters. The Supreme Court in *Clackamas* [ ] was not faced with the question of what level of compensation is required for an individual to be considered as an employee. It is undisputed that the marshals and starters were compensated by being allowed to play golf, for which they would otherwise have had to pay. The EEOC's Compliance Manual generally provides that an individual who meets the **other tests** for "employee" should be considered to be one if compensated in any way.
> . . . Even volunteers may be considered employees if they receive significant remuneration rather than "the inconsequential instances of an otherwise gratuitous relationship." (EEOC Compliance Manual Section 2 – III A 1)[.][17] The marshals perform work for MGM, their work is

---

[17] Section 2 - III(A)(1) reads:

Volunteers usually are not protected "employees." However, an individual may be considered an employee of a particular entity if, as a result of volunteer service, s/he receives benefits **such as** a pension, group life insurance, workers' compensation, and access to professional certification, even if the benefits are provided by a third party. The benefits constitute "significant remuneration" rather than merely "inconsequential incidents of an otherwise gratuitous relationship."

2 Equal Employment Opportunity Commission, Compliance Manual § III(A)(1)(c) (2000)(citing *Pietras v. Board of Fire Comm'rs*, 180 F.3d 468, 473 (2d Cir. 1999); quoting *Haavistola v. Cmty. Fire Co. of Rising Sun Inc.*, 6 F.3d 211, 222 (4th Cir. 1993)(quotation marks in original; emphasis added). At first

> directed by MGM[,] and they are compensated for that work. On this additional ground, MGM is an employer within the meaning of Title VII.

Pla.'s Resp. Br. 7 (emphasis added). In *Clackamas*, the Court addressed whether director-shareholder physicians were "employees" within the meaning of the Americans With Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.* The Court affirmed *Darden's* common-law test, containing sixteen, non-exhaustive criteria, for determining whether a hired party[18] is an employee. *Clackamas*, 538 U.S. at 445 n.5 (quoting *Darden*, 503 U.S. at 323-24). The Court acknowledged that the *Darden* factors were "not directly applicable to this case because we are not faced with drawing a line between independent contractors and employees." *Id.* Instead, the Court decided a narrow question of whether "a shareholder-director is an employee or, alternatively, the kind of person that the common law would consider an employer." *Id.* at 445 n.5. In deciding the narrow question, the Court focused on the "common law touchstone of control" and adopted a EEOC's six-factor test rooted in *Darden*. *Id.* at 449.

In *Cuddeback*, the Eleventh Circuit reaffirmed the eleven-criteria test set forth in *Cobb*, 673 F.2d at 340-41. The *Cobb*

---

blush, this full quotation appears to contradict Edwards's argument and support MGM. However, this quote cites a cases which, as discussed *infra*, support Edwards. *See Haavistola*, 6 F.3d at 222.

[18] Although the record is unclear as to whether marshals are "hired parties," given the procedural posture, the court will assume for present purposes that they are in fact "hired" by MGM.

"hybrid economic realities test"

> calls for application of general principles of the law of
> agency to undisputed or established facts. Consideration
> of all the circumstances surrounding the work
> relationship is essential, and no one factor is
> determinative. Nevertheless, **the extent of the employer's**
> **right to control the "means and manner" of the worker's**
> **performance is the most important factor to review** here,
> as it is at common law . . . . If an employer has the
> right to control and direct the work of an individual,
> not only as to the result to be achieved, but also as to
> the details by which that result is achieved, an
> employer/employee relationship is likely to exist.

*Id.* at 340 (quotation marks in original; citation omitted; emphasis
added); *see also Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d
1256, 1266 (11th Cir. 1997)(referring to *Cobb* as the "hybrid
test"). "Under this test, the term 'employee' is 'construed in
light of general common law concepts' and 'should take into account
the economic realities of the situation,' 'viewed in light of the
common law principles of agency and the right of the employer to
control the employee.'" *Cuddeback*, 381 F.3d at 1234 (quoting *Cobb*,
673 F.2d at 340-41)(quotation marks in original). The *Cobb* court
set forth a nonexhaustive list of eleven relevant factors in this
inquiry:

> (1) the kind of occupation, with reference to whether the
> work usually is done under the direction of a supervisor
> or is done by a specialist without supervision; (2) the
> skill required in the particular occupation; (3) whether
> the 'employer' or the individual in question furnishes
> the equipment used and the place of work; (4) the length
> of the time during which the individual has worked; (5)
> the method of payment, whether by time or by the job; (6)
> the manner in which the work relationship is terminated;
> i.e., by one or both parties, with or without notice and

26

explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the 'employer'; (9) whether the worker accumulates retirement benefits; (10) whether the 'employer' pays social security taxes; and (11) the intention of the parties.

*Id.* at 340 (quotation marks in original; citation omitted). *See also Cuddeback*, 381 F.3d at 1234.[19]

In addition, Edwards touches on[20] the question of whether a "volunteer" counts as an employee under Title VII, which, as discussed *infra*, lends support to her claim that the marshals are employees. This question has not been addressed by the Eleventh Circuit. In *Haavistola*, 6 F.3d at 211, a volunteer firefighter sued her former fire company for discrimination on the basis of sex in violation of Title VII. *Id.* at 214. The district court granted defendant's motion for summary judgment because defendant failed to meet the "15 or more employees" threshold, based, *inter alia*, on the fact that the volunteers received no salary or other cash consideration. *Haavistola v. Cmty. Fire Co.*, 812 F. Supp. 1379, 1386 (D. Md. 1993). The Fourth Circuit reversed. *Haavistola*, 6 F.3d at 213. The court held, *inter alia*, that "[b]ecause compensation is not defined by statute or case law, we hold that it cannot be found

---

[19] The 2004 *Cuddeback* court did not address whether the 2003 *Clackamas* Court's positive treatment of *Darden's* common-law test, containing sixteen, non-exhaustive criteria calls into doubt, or limits *Cobb's* eleven criteria. However, it is of little consequence to the court's analysis, because the lists are non-exhaustive and most of each list's criteria overlap. *Compare Darden*, 503 U.S. at 323-24, *with Cobb*, 673 F.2d at 340-41.

[20] *See supra* note 18 and accompanying text.

as a matter of law. The district court **must leave to a factfinder** the ultimate conclusions whether the benefits represent indirect but **significant remuneration . . . or inconsequential incidents** of an otherwise gratuitous relationship . . . .". *Id.* at 221-22 (emphasis added). The court reasoned that because unpaid volunteer firefighters received myriad benefits, including, state-funded disability pension, survivor's benefits for dependents, scholarships for dependents upon disability or death, group life insurance, and state-tax exemptions for unreimbursed travel expenses, there was disputed material fact. *Id.* at 221.[21] On remand, the trial court separated the issues for trial between the threshold 15 employee issue and the merits of the case. *Haavistola v. Cmty. Fire Co.*, 839 F. Supp. 372 (D. Md. 1994).

*Clackamas* is not on all fours with the instant case. First, the Court expressly noted that its inquiry was limited to whether director-shareholders were employees, an issue not present here. Second, although the Court in *Clackamas* adopted the EEOC's six-factor test, it appears that Edwards desires this court to create a different "test" out of what the EEOC "generally provides" in its welfare and volunteer provisions, which is a different situation from that in *Clackamas*. The court need not go so far. Edwards may be correct that free-golf arguably may constitute in-kind

---

[21] The district court likewise drew an erroneous conclusion of law by failing to utilize the same eleven-factor test prescribed by *Cobb*. *Compare Haavistola*, 6 F.3d at 222, *with Cobb*, 673 F.2d at 340.

28

compensation for services. There seemingly is a *quid pro quo* here*.* The degree or value of such "compensation" is a disputed fact. The record does not reflect how much a round of golf costs an average MGM patron, or how much each marshal is addicted to golf or how many or how few times each marshal plays golf.[22] Despite these current ambiguities, a reasonable juror might draw an inference that marshals would not "work" or "volunteer" as marshals without being compensated via free-golf. This fact dispute is not affected merely because McCay loosened his control over the marshals' access to free golf. McCay's "right to control" the marshals does not disappear merely because he chooses not to exercise the right. Given the current procedural posture, the important "right to control" portion of the test is met. *Haavistola* is persuasive here because it lends support to the proposition that whether there is compensation cannot always be determined as a matter of law. In addition, it helps to define the spectrum of when "benefits" equate to "compensation," at least for summary judgment purposes. Comparing the benefits provided to the volunteer firefighters to the "benefit" of free-golf, the court finds that for a golfing afficionado free-golf may be closer to cash than the firefighters' benefits, particularly in circumstances when MGM admits that

---

[22] This benefit to the marshals arguably falls somewhere near "compensation for services" within the meaning of the Tax Code. *See* 26 U.S.C. § 61(a)(1)(defining "gross income"). There is no evidence as to whether any marshal declared his free golf as income on his income tax return. This will be a good question to ask at trial.

marshals, former marshals, and friends of marshals can play whenever they want. Or, in other words, a jury could reasonably find significant remuneration rather than an inconsequential incident of an otherwise gratuitous relationship, at least enough to survive Rule 56 analysis. It will have to be looked at again under Rule 50 analysis.

The record reflects that MGM fails to direct or supervise the marshals, that no marshal has ever been fired, and that they can come and go as they please. Marshals accumulate no annual leave, MGM pays neither retirement benefits nor social security taxes, and there is no evidence in the record to dispute McCay's assertions that the parties intended no employment relationship. Thus, factors (1), (6), (7), (9), (10), and (11) in *Cobb* support MGM. However, MGM furnishes the golf-carts and the place of work, and the marshals ensure that pace of play on the course is monitored. Thus, factors (3) and (8) support Edwards. The "skill required" factor cuts both ways. If a majority of the *Cobb* factors controlled whether or not there was an independent contractual relationship between MGM and its marshals, the marshals could not be employees. However, there is no precedent for establishing the relationship merely by a majority of the factors. The "right to control" arguably may outweigh the other factors. And, don't forget the facts that MGM furnished the equipment and the place of work. Although weak, there may be enough evidence upon which a jury could

reasonably find that an employment relationship existed between the marshals and MGM.

B. *Hostile Work Environment Sexual Harassment*

As discussed, Edwards has demonstrated a basis for finding MGM liable for McCay's actions. The other elements of a *prima facie* case of hostile work environment sexual harassment require that Edwards establish that (1) she is a member of a protected group; (2) she was the subject of unwelcome sexual harassment; (3) the harassment occurred because of her sex; and (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc). The only elements of the *prima facie* case that are in dispute are whether Edwards was the subject of unwelcome sexual harassment and whether the harassment was sufficiently severe and pervasive to be actionable.

The court's inquiry here has both a subjective and objective component. "The employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Mendoza*, 195 F.3d at 1246 (quotation marks in original; citation omitted). In assessing whether harassment is objectively severe and pervasive, the court must look to (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening and humiliating or

31

just a mere utterance; and (4) whether the conduct unreasonably
interferes with the employee's work performance. *Hulsey v. Pride
Restaurants, LLC*, 367 F.3d 1238, 1247-48 (11th Cir. 2004)(citations
omitted). In considering these factors, the court must apply a
totality-of-the-circumstances approach. *Id.* at 1248; *Miller v.
Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002).
Defendants fail to direct the court to any court decision, binding
on this court or not, in which an employer who purportedly engaged
in a similar quantity and degree of obscene, insulting, and/or
offensive behavior, such as McCay allegedly engaged in here,
prevailed on summary judgment. *See* Defs'. Mot. Summ. J. Brief 13-
15. Defendants argue that the Eleventh Circuit "has held that
similarly alleged egregious conduct did not meet the 'severe and
pervasive' standard." *Id.* at 14 (citing *Mendoza*, 195 F.3d at 1247-
1248). This, however, ignores the procedural posture of this case.
In *Mendoza*, the plaintiff, Mendoza, had *already* survived summary
judgment on her hostile environment claims. *Id.* at 1238. The cases
are the same to the extent that Mendoza testified to only one
incident of physical touching. *Id.* at 1243. However, Mendoza also
testified to only one occurrence of an untoward remark, namely,
"I'm getting fired up, too," and further admitted the alleged
harassment never involved any vulgar language. *Id.* at 1243.
Although Edwards admits that McCay touched her only once,
(allegation 15), this viewed in the context of the other verbal

incidents, precludes a finding that McCay's conduct was, as a matter of law, not severe or pervasive. McCay's alleged comments are far more severe and frequent than those in *Mendoza*. *See supra* Edwards's allegations 1-19. There is sufficient testimony to suggest that Edwards was the target of pervasive unwelcome sexual comments and others remarks with sexual overtones. A jury could find pervasiveness. Many of McCay's alleged remarks do not require the "overtone" qualifier and are expressly graphic. In addition, Edwards testified that she requested Carmack to alter her schedule so as to avoid working when McCay was there. Edwards likewise enlisted the help of Carmack and several marshals to avoid being alone with McCay. She also testified that she wore less revealing clothing because of McCay's comments. A reasonable inference can be drawn that Edwards subjectively perceived that McCay's harassment altered her employment. Although the court agrees that the totality-of-the-circumstances test is difficult to apply in a completely objective manner, defendants would have the court completely abandon this test in favor of a test that would evaluate each individual instance of alleged harassment in a vacuum. This court has no doubt that a reasonable jury, under the totality of the circumstances, if they believe Edwards and disbelieve McCay, could find that the harassment to which Edwards was allegedly subjected was sufficiently severe and pervasive to alter the terms and conditions of her employment.

33

*C. Constructive Discharge*

As the Supreme Court has instructed, "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes. The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Penn. State Police v. Suders*, 542 U.S. 129, 141, 124 S. Ct. 2342, 2351 (2004)(citations omitted). Defendants dispute whether Edwards acted as a reasonable person in deciding to quit, and, further, that the facts concerning her resignation centered not around sexual harassment, but rather that she feared being fired or prosecuted for stealing. Edwards testified that McCay presented her with the option, "Well, if you give me what I want, then maybe you'll get what you want," and further testified that she "couldn't take it anymore." MGM neither had a sexual harassment policy nor a formal grievance procedure. Edwards likewise complained to her superiors, Lee and Carmack, resulting in no change in McCay's behavior. Viewing the facts in a light most favorable to Edwards, there is a dispute as to why she resigned. Under her version of the facts, a reasonable jury could find that a reasonable person in Edwards's position would have felt compelled to quit.

*D. Invasion of Privacy*

34

Edwards invokes the Alabama tort theories of invasion of privacy and intentional infliction of emotional distress. The only possible invasion of privacy claim available to Edwards is "intrusion upon the plaintiff's physical solitude or seclusion." *See Phillips v. Smalley Maint. Serv., Inc.*, 435 So. 2d 705, 708 (Ala. 1983). To succeed on such an Alabama tort of invasion of privacy, Edwards must show "(1) that the matters intruded into are of a private nature; and (2) that the intrusion would be so offensive or objectionable that a reasonable person subjected to it would experience outrage, mental suffering, shame, or humiliation." *Ex Parte Atmore Cmty. Hosp.*, 719 So.2d 1190, 1194 (Ala. 1998)(citation omitted); *see also Armstrong v. Standard Furniture*, 197 Fed. Appx. 830 (11th Cir. 2006). The Alabama Court has likewise held that "**extensive egregious inquiries** into one's sex life, coupled with intrusive and coercive sexual demands, constituted a wrongful intrusion into one's private activities sufficient 'to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities.'" *Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 826 (Ala. 1999)(quoting *Phillips*, 435 So. 2d at 711)(emphasis added). The court in *Phillips* held that the employer had extensively inquired into the plaintiff-employee's sex life and otherwise had wrongfully intruded when the employer questioned plaintiff two to three times a week for three months behind "locked doors" about the plaintiff's sexual experiences, e.g., what

"positions" the plaintiff and her husband used. *Id.* at 707. The employer also made numerous coercive sexual advances. *Id.* at 707. The employee suffered severe emotional trauma, including contemplating suicide, chronic anxiety, and physical problems, which resulted in surgery, all of which were the outgrowth of the harassment. *Id.* at 707-708. In *Armstrong*, plaintiffs' depositions revealed that the putative tortfeasor regularly made comments and requests concerning the sex life of plaintiffs, similar to those of the instant case. *Compare id.* at 834 (listing accusations against the employer, such as "would constantly talk about sex," lick his tongue out at plaintiffs, groped a plaintiff, inquired as to whether a plaintiff was "menstruating because he wanted some 'cat'," and stating "daily" that employer wanted to have sex with a plaintiff) *with supra* pp. 9-14 (Edwards's accusations).

Here, McCay allegedly said to Edwards "with that many kids, you must enjoy sex an awful lot," asked her what "color panties [she] had on or if [she] had any on at all," and to "meet [McCay] in the maintenance shop for sex." Edwards also testified that McCay would "stop for a while, sometimes weeks at a time and then he would resume right back." In April 2007, Edwards testified that the inappropriate comments were "constant." *Phillips* suggests that the employer must make more aggressive inquiries into the plaintiff's sex-life, such as questions about personal sexual preferences, to trigger a invasion of privacy claim, and that they should perhaps

be daily or weekly. However, *Armstrong* suggests that Edwards should survive summary judgment when the comments are regular, but are also more pervasive and graphic. Given the procedural posture here, the court finds that there is enough evidence to support a jury's finding that McCay invaded Edwards's privacy.

Defendants deny that MGM can be held liable under *respondeat superior* for the acts of McCay on Edwards's invasion of privacy claim. Given the court's discussion *supra* regarding *Faragher* and *Ellerth*, this court doubts that MGM can avoid liability for McCay's alleged behavior if it happened as Edwards describes it. A trial will provide defendants with an opportunity to convince a jury otherwise, that is, if plaintiff can first prove the existence of 15 employees.

*E. Intentional Infliction of Emotional Distress*

Defendants point out that Edwards has presented no evidence of any "severe emotional distress" to support her claim of intentional infliction of emotional distress. *See Ex parte Mutual Sav. Life Ins. Co.*, 698 So. 2d 772, 774 (Ala. 997). The court agrees with defendants. Edwards has failed to offer evidence that she sought medical help or otherwise manifested distress. She has not offered any law supporting this claim, effectively abandoning it. Defendants' motion will be granted as to this claim.

*III. Conclusion*

For the foregoing reasons, defendants' motion for summary

judgment will be granted with respect to Edwards's claim of intentional infliction of emotional distress. With respect to Edwards's sexual-harassment hostile-work-environment claim and constructive discharge claim under Title VII, and with respect to her state law claim for invasion of privacy, MGM's motion will be denied. A separate order will be entered accordingly.

DONE this 22nd day of January, 2009.


WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE